DOLORES SANTAELLA NEGRÓN, Plaintiff, Appellee and Appellant, *v.* PHILIP LICARI and SAN JUAN DARLINGTON, INC., Defendants, Appellees, and Appellant the latter.

No. 12367. Decided November 22, 1961.

*Benicio Sánchez Castaño* and *R. Rivera Cervera* for defendant and appellant. *Ángel Viera Martínez* for plaintiff and appellant.

Division composed of Mr. Justice Blanco Lugo, as Chief Judge of Division, and Mr. Justice Rigau and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This is an action for damages for personal injuries. The defendant San Juan Darlington, Inc. is the owner of and operates a twelve-story building known as "San Juan Darlington" at 600 Fernández Juncos Avenue, Santurce, Puerto Rico. The first floor of said building is devoted to offices and commercial establishments and the remaining eleven stories are devoted to the rental of residential apartments. The defendant Philip Licari is an attorney at law and at the time of the events herein he had his office in the first floor of the San Juan Darlington, which office he occupied as tenant of the codefendant. The aforesaid building has a corridor along the center of its first floor with access to several offices and businesses which are established on either side of said corridor.

On the day of the accident the plaintiff and her sister left a beauty parlor of which they are clients situated on the first floor of the Darlington Building and walked along said corridor towards the street. As they thus walked, the defendant Licari suddenly opened the door of his office hitting the plaintiff on her right side, throwing her to the floor. Said door opens outward, that is, towards the corridor and it is 36 inches wide. It was opened by Mr. Licari while he was inside his office.

According to the findings of fact of the trial court, the accident took place on July 22, 1955; that day the victim was examined by a physician at her house; on the 23d she was examined by a bone specialist who was called to her house; that same day X-Ray pictures were taken at patient's house; on July 24 she was taken to a hospital and was operated next day. Plaintiff returned on next August 9 to her home in an ambulance, and stayed in bed for more than two months. In October, the physician gave orders that she be taken out of bed because she was suffering from pneumonia and she spent half an hour every day in a wheel chair. At the time of the trial, on November 8, 1956, she had been able to sit only on a wheel chair; she could not walk, not even on crutches. Prior to the accident the plaintiff enjoyed good health and walked without any aid. At the time of the accident the plaintiff was 74 years of age and weighed 140 pounds.

The injuries suffered by the plaintiff are described by the trial court in its opinion as follows:

"The medical examination made by Dr. Espinosa on the day following the fall revealed the existence of trauma in both shoulders and arms and trauma with fracture in the left hip. The trauma on the right side was an ecchymosis in the lateral part of the right arm from the shoulder to the arm. There was an ecchymosis on the left shoulder which also extended to the arm. There was an extravasation of the blood in the conjunctive of the left eye and there was a dislocation of the hip which required an operation. In the operation the hip was opened to reduce the fracture with internal fixation by a nail. The subcapital fracture was immediately under the head of the femur with dislocation of the bone. After the operation a cast was placed from the ankle covering the foot in order to prevent any outward movement of the leg. When she left the Auxilio Mutuo, plaintiff remained in her home in a hospital bed until she was able to sit in a wheel chair. According to the last X-Ray which was made about two weeks before the trial, the doctor authorized the plaintiff to stand on her feet but holding for support on two bars which were constructed for that purpose. The last medical examination of the patient revealed:

(1) disuse atrophy of the limb due to the fracture; (2) weakness of the limb caused by disuse; (3) inflammation of the left knee with considerable limitation of the movement of the knee, a limitation of 65° flexion, the normal being 90°; (4) certain secondary limitation in the movement of the other leg, the right leg. This condition affects the patient psychologically and morally due to her inability and incapacity to attend herself as well as the physiological functions in general. The more recent X-Rays show that the fracture has healed.

"Dr. Espinosa testified on the witness stand that at that time the prognostic was of a reserved nature, that is, the plaintiff's condition could develop eventually satisfactorily, that the inflammation of her left knee could give her much trouble perhaps indefinitely; or also that necrosis of the head of the bone could follow, that is, could die and become deformed. This would cause great pain when standing and it would affect the circulatory system making it necessary perhaps to remove, by surgery, the head of the bone."

The plaintiff claimed $50,000 for damages, plus medical expenses incurred and costs and attorney's fees. The Superior Court dismissed the complaint as to defendant Licari, and granted it as to the San Juan Darlington, Inc. ordering it to pay $12,000 for damages, $2,451.06 for medical expenses plus costs and $500 for attorney's fees.

The appellant alleges that the trial court erred (1) in considering the evidence sufficient and in deciding that the landlord was negligent and in failing to decide that the plaintiff as well as codefendant Philip Licari has been negligent; (2) in sentencing the landlord without evidence and in "making subjectives findings thereby depriving the appellant of its right to examine and of the due process of law"; and (3) in ordering it to pay a disproportionate compensation without any legal basis and in imposing attorney's fees.

We shall discuss the first and second assignments of error jointly because they are closely related. In support of its position the defendant raises the following three questions in its brief, which we shall consider: (a) That the tenant Licari and not the landlord, is liable for the damages suffered

by plaintiff because Licari and not the landlord had the control of his office and of the door of said office; (b) That the landlord was compelled to have that door opening outward and not inward, because it was so required by the Regulations of the Planning Board of Puerto Rico, the Fire Service Regulations, the "National Building Code" and because the drawings of the building were approved by the Bureau of Permits of Puerto Rico; (c) That the evidence does not have the scope or legal consequences of rendering the defendant liable for the damages.

*Liability of the landlord.* It is a well-settled principle, consistently followed by the authorities, that when a building consists of several apartments or rooms and they are leased to different tenants, the entrances, foyers, staircases and halls of common use are, except when otherwise provided, in the possession and under the control of the landlord and, consequently, the responsibility for their condition and safety rests on the latter. It is his duty to see that said facilities of common use are kept in such conditions as to offer security to the tenants as well as to the persons who legitimately enter the building. Among the persons so entering the building legitimately are the clients of the businesses established therein. *Ramírez v. Hotel Condado*, 68 P.R.R. 880, 882 (1948); *Torres v. Fernández*, 56 P.R.R. 459, 470 (1940); *Nunan v. Dudley*, 91 N.E.2d 840 (1950); *Wool v. Larner*, 26 A.2d 89, 92 (1942); *Pickford v. Abramson*, 152 Atl. 317, 318 (1930); *United Shoe Machinery Corp. v. Paine*, 26 F.2d 594 (1928); 26 A.L.R.2d 476; 25 A.L.R.2d 446; 97 A.L.R. 221; 25 A.L.R. 1273; 2 Restatement of the Law of Torts 976, § 360; Prosser on Torts 471, § 80 (2d ed.); 2 Harper & James, The Law of Torts 1516, § 27.17.

Therefore, we cannot flatly discard the possibility that the landlord might carry liability. The victim was injured by a part or accessory of the building which struck her while

she was walking along the main corridor of common use; she was not in the office of tenant Licari, not even entering or leaving said office. The plaintiff was legitimately using said corridor, for she was coming out of one of the businesses established in that floor of the building (the beauty parlor) and walked towards the street where she intended to take a taxi.

██ *The Regulations.* Let us now consider defendant's contention to the effect that it was compelled to have that door opening outward because it was so required by the government regulations. Defendant cites the Building Code, which is Regulation No. 7 of the Planning Board of Puerto Rico and it makes reference to §§ 113(b) and 125 of said Regulations. 23 R.&R.P.R. § 43–1 *et seq.*

In the first place, it appears from the evidence that when the drawings of the San Juan Darlington were approved, said Building Regulations had not yet come into existence. The drawings of that building were approved by the Bureau of Permits on August 4, 1950. The Building Regulations of Puerto Rico was adopted by the Planning Board four years later, on August 11, 1954, and approved by the Governor on August 13 of the same year. 23 R.&R.P.R. § 43–1 note. At the time the drawings of the building were approved, Puerto Rico did not have a building code, as testified by Mr. Héctor Deliz, the expert called by the defendant, who had been Permit Official precisely when those drawings were approved. It is clear, therefore, that since the Building Regulations did not exist in 1950, said regulation could not have required anything in connection with the drawings in question.

In the second place, let us see whether the sections cited by the defendant from the aforesaid Regulations, in force at present, have the scope attributed to them. Section 113 is entitled "Exit Facilities in Places of Assembly". The regulation defines "places of assembly" as follows:

"Places of assembly means rooms or spaces *in which provision is made for the seating of one hundred or more persons* for religious, recreational, educational, political, social, or amusement purposes or for the consumption of food or drink. Such room or space shall include any occupied connecting room or space in the same story, or in a story or stories above or below, where entrance is common to the rooms or spaces." (Underscores supplied.) 23 R.&R.P.R. § 43–21.

Subdivision (b) of § 113, cited by the defendant, provides, insofar as pertinent, that "In places of assembly, exits shall be provided at the rear of the auditorium, leading into the foyer or into a passageway to the street. These exits shall be not less in width than the full width of the aisle or aisles leading thereto." 23 R.&R.P.R. § 43-823 (b).

From an examination of the Building Regulations it appears that said § 113 applies to "places of assembly", that is, to those places in which "provision is made for the seating of one hundred or more persons for religious, recreational, educational, political, social, or amusement purposes or for the consumption of food or drink." In other words, said section refers to churches, schools, theaters, night clubs, restaurants, etc., and it does not apply to a law office. The reason for this section is clear; its purpose is to facilitate the rapid exit of a great number of persons in cases of fire or other emergency. For this reason these exits mentioned in this section "shall be not less in width than the full width of the aisle." This is not our case either. The door of Mr. Licari's office is 36 inches wide; the corridor is 13½ feet wide at that place.

Defendant cites § 125 of the Building Regulations. This section appears under a subdivision of the Regulations entitled "Other Exit Facilities Requirements". Insofar as pertinent this section provides:

"Doorways opening onto a street, or to a court or open space connecting with a street, and serving as a required exit *for more than 40 persons* shall have the doors so hung as to swing

open in the direction of exit travel; but this requirement shall not be construed to prohibit the use of sliding doors in stables, garages, and shipping and receiving rooms of business buildings and storage buildings.

"All exit doors in rooms occupied *by 40 or more persons* and all exit doors in exits *from places of assembly* shall be so hung as to swing open in the direction of exit travel." (Underscores supplied.) 23 R.&R.P.R. § 43–882.

It may be seen that the above-copied provisions apply to (1) spaces "serving as a required exit for more than 40 persons," (2) "rooms occupied by 40 or more persons," and (3) to exit doors from "places of assembly," that is, places in which provision is made for seating 100 or more persons. Neither is § 125 applicable to a law office.

Defendant also alleges that the door in question must open outward because it is so required by specific sections which it cites from "Rules and Regulations on Fire Prevention" of the Puerto Rico Fire Service. These regulations were in force when the drawings of the building were approved. They were approved in 1946 and from an examination of its text it seems that they may be considered as the forerunner of the existing Building Regulations. The sections cited by the defendant from these regulations are § 11(a) of Title I and section II(d) of Title II, the text of which was published by the former Insular Fire Service of Puerto Rico, without date, but which was allegedly approved by the Governor on May 10, 1946 (Defendant's Exhibit B).[1]

The reference made by defendant to § 11(a) of Title I of those Regulations must be an error because that subdivision merely provides that no inflammable liquid will be allowed in a theater. We suppose that defendant meant section VI of Title I which provides for exit doors. Let us examine those two provisions of the Rules and Regulations of the Fire Service.

---

[1] The existing regulations of the Puerto Rico Fire Service appear in 25 R.&R.P.R. § 314–1 *et seq.*

Title I refers to theaters and has no application whatsoever to professional offices. For that reason section VI of that Title and which refers to exit doors of theaters sheds no light on this case. Other sections of said Title I (theaters) refer to seats or chairs, projection rooms, stage, dressing rooms, etc.

Another section of these Regulations of the Fire Service cited by the defendant, section II(d) of Title II, is not applicable to cases like the present one either. The aforesaid Title II deals with "Places of Assembly." defined under its section I as follows:

" 'Places of assembly' include all buildings or parts of buildings used for the assembly of persons *for entertainment or amusement,* including all places where persons congregate *such as dance halls, bars, cabarets, night clubs, restaurants, hotels, etc.*" [2] (Underscores supplied.)

Section II(d) of said Title II (Places of Assembly) provides for "exit doors". The aforesaid section defines the term "exit doorway" and to that effect it says that it means "the door or any other opening through which persons may pass safely *from the place of assembly* to a street or to an open space which provides safe access to a street". (Underscores supplied.) Section I(b).[3] Said section II(d) provides:

"All exit doors in rooms occupied by 50 or more persons and all exit doors in exit ways from places of assembly shall be hung to swing in the direction of exit travel, but this requirement shall not be construed to prohibit doors swinging both inwards and outwards".[4]

The aforesaid provisions of the Rules and Regulations of the Fire Service refer to theaters and to "places of assembly" and they are not applicable to professional offices.

■ We find no merit in the allegation that the "National Building Code" required the defendant to hang the door opening outward. Said code ("National Building Code") is

---

[2] The provision in force is essentially the same. See 25 R.&R.P.R. § 314–21.

[3] The provision in force is identical. See 25 R.&R.P.R. § 314–21(b).

[4] The provision in force is identical. See 25 R.&R.P.R. § 314–22(d).

neither a law nor an official government regulation; it is a manual or a draft for a building code proposed by a corporation board for fire insurance suits, which is a private entity and which is called "National Board of Fire Underwriters". No matter the weight of respect that this draft for a building code may carry, it does not have the force of law. Furthermore, the pertinent part of said "code" which was read by the defendant's expert at the trial, refers to exit doors for more than 40 persons. It is clear that the requirement that the doors should swing outward applies to places of assembly, that is, rooms where a large group of persons assembles, such as dance halls, restaurants, night clubs, etc., and not for offices of professional people, such as in the case at bar.

Another argument presented by the defendant is that the Bureau of Permits approved the drawings of the building and that said drawings show the doors of the first floor opening to the hall. As we have pointed out previously, defendant's expert, Héctor Deliz, was a permit officer when the drawings were approved. He testified that there did not exist in Puerto Rico, at that time, a building code but there did exist a Fire Service Regulation which contains, he said, many rules taken from the "National Building Code." He laid special stress on "specifically that part known to everybody which says that in public places of assembly, theaters and rooms where persons assemble, the exit doorways shall open in an outward direction ... may not be obstructed by metals bars, irons or any object preventing the free opening of the door in an outward direction." In the light of that explanation, it is significant to point out that the Fire Service Regulations in referring to exit doors of *theaters* provides that "No doorway (window or any other opening) on any floor to be used by the public may be obstructed by metal bars, chains, iron grates, or screens." To better explain what he had in mind, the expert immediately gave the theater as an example.

 Since there did not exist any regulation to the effect that a door of an attorney's office should open outward, the Bureau of Permits did not require, nor could it require it; since there was no regulation prohibiting it, it could not nor did it prohibit it. For that reason, since the drawings comply (presumably) with the statutory requirements existing at the time they were approved, it was incumbent on the Bureau of Permits to approve them as it did. The approval by the Bureau of Permits means that the drawings approved comply with the minimum requirements of the law (and the regulation made under the authority of law), but in no way may such an approval absolve defendant from civil liability. *Girard* v. *Fine*, 85 N.Y.S.2d 418, 419 (1948). In this case, also dealing with a door, it was said that the fact that compliance was had with the requirements of the building code and that a building permit was obtained, did not relieve the defendant from his duty to furnish a safe method of ingress and egress.

We have now come to the final part of the analysis of this matter. Did the defendants (the landlord and the tenant) incur liability under § 1802 of our Civil Code, or should the injury caused to plaintiff without any fault on her part and while she was in the exercise of a lawful act, be left unrepaired?

 A door is not an intrinsically dangerous object per se. The courts have generally refused to grant compensation for damages suffered by persons when the door is well constructed and functioning properly and when the injured party suffers damages upon using the door, that is, while entering or leaving the premises. In such cases the visitor is required the proper care in passing through a door and in operating the same. 16 A.L.R.2d 1166. Nor is the owner of a building liable when a third person has carelessly released a swinging door and caused injury to the person coming behind him. Those doors, it has been said, are of common

use in commercial premises and it is to be expected that persons using them exercise the necessary care. *Ibid.* 1176.

However, the rule varies in the case of doors which open into halls or corridors and stairways and the injured party is neither entering nor leaving by the door but is walking through the hall or stairway at the moment he is struck by the door. In those cases the authorities maintain that it is up to the judge to evaluate the facts and to determine whether a door thus constructed is dangerous per se and whether the owner of the building is liable or not for the damages it may cause. *Ford* v. *John Wanamaker*, 150 N.Y.S. 795 (1914); *Campbell* v. *Hughes Provision Co.*, 90 N.E.2d 694 (1950); *Paine* v. *Armour & Co.*, 80 N.E. 500 (1907); *McDermott* v. *Sallaway*, 85 N.E. 422 (1908); *Buscemi* v. *Chefford*, 8 N.Y.S.2d 578 (1938); *President & Directors of Georgetown College* v. *Hughes*, 130 F.2d 810 (1942); *Zeder* v. *Church*, 88 N.Y.S.2d 617 (1949); *Morelock* v. *De Graw*, 112 S.W.2d 126 (1937); 16 A.L.R.2d 1171-1172. In those cases the rule varies because the situation is different. The person to be injured is walking with the necessary care when he is struck by an object which suddenly and without notice gets in his way, something which he cannot anticipate. Under these circumstances, to have a door, which upon being used normally, functions in such a manner as to injure the persons who are walking with ordinary care along a hall or a stairway, constitutes lack of the care due the public and it entails liability. *President & Directors of Georgetown College* v. *Hughes, supra; Morelock* v. *De Graw, supra;* 16 A.L.R.2d 1171.

■ The cases of *Goose* v. *Hilton Hotels*, 79 P.R.R. 494 (1956) and *Muñoz* v. *R. Fabián & Co.*, 71 P.R.R. 454 (1950) cited by the defendant in its brief are not applicable because they deal with situations different from that under consideration. It is true that in *Goose* v. *Hilton* it was said that "there is no obligation to protect the visitor against dangers *which*

*are known to him, or which are so apparent that he may reasonably be expected to discover them*", but there the object was a stairway. The existence of a stairway on which a person must tread is apparent and obvious and it is to be presumed that a person shall exercise prudence and care in going up or down the stairs. It was also said in the case of *Goose* v. *Hilton* that a visitor is entitled "to assume that proper care has been exercised to make the premises safe for him, and he is not required ... to be on the alert for possible defects". This case falls within the second alternative; the plaintiff in walking along the hall although bound to notice the stairways or other apparent dangers that might have existed in the hall, was not bound to expect and anticipate that an object arising from the floor, or falling from the ceiling or the walls, might suddenly strike her. The other case cited, *Muñoz* v. *Fabián, supra*, dealt with the existence of a step in the middle of a passageway and it was therefore concluded that the person walking through the aisle had the obligation of noticing the step and exercising due care. In these cases dealing with stairways, except under special circumstances, the owner of the building is not liable because, as was previously said, they are apparent and obvious dangers and the persons who travel thereon must do so prudently.

Having considered the applicable law, we shall now turn to our case. This is a main corridor on the ground floor of a twelve-story building, in which at the time of the accident there were 312 families which, in the opinion of the manager of the building, consisted of about 500 persons and in which floor and on both sides of the main corridor there were a number of business premises, nine of which were occupied at the time of the accident. Among the businesses established at that time there were a drugstore, a beauty parlor, and a restaurant.

Although it is to be supposed that not all of the permanent residents of the building used said corridor since those that

arrived by automobile used the elevator or the rear entrance of the building, yet, a part of those residents might frequently use the corridor in order to go out to the street to take taxis, busses, etc. On the other hand, a great number of persons who work in the commercial premises of the first floor and many of their clients and visitors use said main corridor. Defendant's expert himself testified, on cross-examination, that at certain times a great number of persons coincide in the traffic along said corridor; about 50 persons, he said, and added that he had personally witnessed the crowds at those times.

■ The door which caused the accident, the one of Mr. Licari's office, opened outwards because it was thus constructed and so kept by the owner and landlord without there being any official regulation requiring or prohibiting it. As we have seen, the mere construction or use permit did not render him immune from liability under § 1802. A hall with access to such a large number of persons, through which from dozens of persons on the days of scarce movement to hundreds of persons on the days of much traffic travel and which has doors that might open outward without any notice and without any protection for persons passing thereby, and which open in that direction without any specific requirement of law or regulation, constitutes an undue risk for such visitors. A slight consideration shows that there exists the probability, and not the mere possibility, that there must come a time when there shall coincide in the hall the edge of the door and the head of a human being. This risk constitutes the negligence that may cause injury to another which the wrongdoer has the obligation to remedy. We should bear in mind that the premises defined by official regulations as places of assembly must keep their doors opening outward. It may be argued that this may also constitute a risk for people passing by. Perhaps it is, but in those cases this argument is set off by the convenience of having those doors

open easily and outwardly in order to prevent hundreds of persons from dying in cases of emergency. In cases of places of assembly the question frequently arises that there are several interests in conflict and that the legislature in following its public policy is compelled to choose that solution which is most convenient and most useful for the public in general. At times the solution which should be rationally adopted as the best for the community in general may turn out to be inconvenient or burdensome for some of its members, but this is a reasonable price to be paid for the enjoyment of a peaceful and civilized life. In the absence of such compromises human life would quite resemble the undesirable picture described by Thomas Hobbes, in which each human being would be in constant struggle with his neighbor and in which the life of man would be brief and brutal.[5]

We agree with the trial judge in that defendant San Juan Darlington, Inc. was liable, but not tenant Licari. The latter, at the time of the accident, was in the exercise of a lawful act, opening the door of his office, which act ordinarily does not imperil the security of third persons. As previously pointed out, the plaintiff was not inside Mr. Licari's office nor was she entering or leaving the office. Nor did the tenant incur negligence in having drapes on the inside of his office for no one who rents a place with glass doors and glass walls is bound to live or work in a showcase.

The third and last error assigned by the defendant consists in alleging that the compensation is disproportionate and that the court erred in imposing on appellant the payment of attorney's fees. In cases for damages, the amount of compensation fixed rests with the sound discretion of the trial judge and it should not be disturbed unless it is manifestly erroneous or exaggerated. *The Conjugal Partnership, Etc.* v. *Cruz*, 78 P.R.R. 335 (1955); *Dávila* v. *Land Authority*, 78 P.R.R. 817 (1955); *Baralt* v. *Báez*, 78 P.R.R.

---

[5] Leviathan (1651).

115 (1955); *Prado* v. *Quiñones*, 78 P.R.R. 309 (1955); *Goose* v. *Hilton Hotels*, 79 P.R.R. 494 (1956). Since we believe that this aspect of the judgment of the trial court is not manifestly erroneous or exaggerated, we affirm the same. As to the imposition of attorney's fees, we believe that defendant is correct since in our opinion it does not constitute obstinacy to defend oneself from a complaint for $52,000 under the circumstances of this case in which to determine the applicable law could be object of honest discrepancy.

The foregoing disposes of plaintiff's appeal wherein she assigned as error the dismissal of the complaint as to defendant Licari.

The judgment appealed from rendered by the Superior Court, San Juan Part, on May 22, 1957, is hereby modified so as to eliminate the award of attorney's fees, and as thus modified, it is affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Santana Becerra did not participate herein.